*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2016-001

APRIL TERM, 2016

| | | |
|---|---|---|
| In re O.S., Juvenile | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Chittenden Unit, |
| | } | Family Division |
| | } | |
| | } | DOCKET NO. 1-1-14 Cnjv |

Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Mother and father separately appeal from a family court judgment terminating their parental rights to the minor O.S. Mother contends that the court: (1) violated her statutory and due process rights by failing to hold a contested disposition hearing prior to changing the permanency goal to termination of parental rights; and (2) committed reversible error by terminating her parental rights notwithstanding her stipulation to a CHINS adjudication in which she "admitted wrongdoing and accepted full responsibility" for the child's injuries. Mother also contends that the court erred by engaging in "speculation" about her drug use, and by failing to explain how the cause of the child's injuries "related to [m]other's current ability to parent." Father contends: (1) the court's reasons for concluding that he could not resume parental responsibilities within a reasonable time were flawed; (2) the court's findings concerning his interactions with O.S. and the role he played in the child's life were not supported by the evidence; and (3) the court's finding concerning father's mental stability was unsupported and erroneously shifted the burden of proof. We affirm.

The facts may be summarized as follows. O.S. was born in November 2013. He lived with mother and father at his paternal grandmother's home. Mother stayed at home to care for O.S. while father worked and provided some childcare assistance, although the court found that "the vast majority of the child's care was performed by" mother.

In late December 2014, when O.S. was a little short of two months old, his paternal grandmother noticed a lump on his chest. A pediatrician who examined him referred him to Fletcher Allen Medical Center where a pediatric doctor arranged for x-rays and a skeletal survey. These revealed that O.S. had suffered bone fractures of eight separate ribs on his left and right sides and his back, as well as a broken tibia. Callus lines that form when bones heal revealed that no single incident was responsible for the injuries. The doctor concluded, and the court found, that O.S. had suffered multiple, non-accidental traumas over a sustained period of time. Neither parent provided an adequate explanation for the injuries to the doctor, who reported the matter to the Department for Children and Families (DCF). In response to a DCF inquiry, father recalled a time when O.S. had almost slipped off the bed, and another time when he found him

on the floor near where mother was sleeping. Mother mentioned one incident about three weeks earlier when she "shook him a little."

O.S. was taken into DCF custody and initially placed with father, who had separated from mother. After a few weeks, father proved unable to care for the child, who was then placed with a foster family, where he has since remained. Mother was charged with domestic assault and cruelty to a child. A CHINS petition was filed in January 2014. The initial case plan filed in February 2014 proposed a concurrent plan for reunification or adoption. Supervised visitation and family time coaching were provided to the parents under the plan, and mother began substance abuse counseling. In June 2014, parents stipulated to a CHINS adjudication. Mother acknowledged in the stipulation that she was the child's primary caregiver, that the child was under her general care and supervision during the time in which the injuries occurred, that she shook the child one time three weeks before his visit to the hospital, and that other than the one incident she did not have an adequate explanation for how the injuries occurred. A disposition hearing was scheduled for July 2014.

The scheduled disposition hearing was continued to afford mother's attorney additional time to review the updated disposition plan from early July 2014, which called for reunification within three to six months or adoption. In August 2014, father experienced a mental health crisis in which he threatened mother and others, and his visits with O.S. were temporarily suspended. In October 2014, DCF submitted a revised plan calling for termination of parental rights. Mother's presentation at subsequent visits with O.S. began to raise serious concerns. In May 2015, and again in September 2015, she tested positive for non-prescribed Oxycodone, and she refused to be tested in other months. In August 2015, mother pled guilty to the criminal charges and received a sentence of 4 to 42 months, all suspended, and was placed on probation.

An evidentiary hearing on the TPR petition was held over two days in September 2015, and the court issued a written ruling in November 2015. The court found that although both parents interacted well with the child during visits, the depth of their relationship was limited, and mother had more recently disengaged while testing positive for drugs. The court also found that the child had lived almost his entire life with his foster parents, that he considered them to be his parents, was well integrated into his home and community, and was thriving.

As to parents' ability to resume parental responsibilities, the court acknowledged their argument "that even in the absence of a court-approved disposition plan, they have already completed many of the services DCF has sought," including substance-abuse assessments and counseling, and attendance at visits, meetings, and court proceedings. The court found, however, that the "fundamental question" of how the child had received his severe, multiple injuries remained unanswered, and neither parent had offered an adequate explanation. Mother had also more recently tested positive for non-prescribed drugs, and father continued to lack independent housing. The court concluded that neither parent could resume parental duties within a reasonable time, measured from the perspective of the child's needs for permanence and stability. Accordingly, the court determined that termination of parental rights was in the best interests of the child. These appeals followed.

2

Mother contends that the court violated her statutory and constitutional rights by revising the permanency goal to termination of parental rights without holding a contested disposition hearing. The argument is unpersuasive. First, we note that the record does not show that she preserved these arguments for review on appeal by asserting them at any point below. See In re A.M., 2015 VT 109, ¶ 28, __ Vt. __ ("To properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." (quotation and alteration omitted)). While she objected to the original disposition proposal, she did not make the argument she is making here when DCF changed its permanency goal. Furthermore, while the statutory scheme provides that a disposition hearing is to occur "no later than 35 days after a finding that a child is in need of care and supervision," 33 V.S.A. § 5317(a), we have held that the timeframe "is not mandatory," In re D.D., 2013 VT 79, ¶ 24, 194 Vt. 508, and that the court "may terminate parental rights at the initial disposition proceeding if the court finds by clear and convincing evidence that termination is in the child's best interests." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29. We find no error in DCF changing its disposition position in response to changing circumstances. Having said that, we do not condone extensive delays in reaching an initial disposition order such that DCF is pursuing termination of parental rights before the parents have an opportunity to comply with disposition conditions and seek reunification. In another case, the prejudicial impact of delay might make it inappropriate to pursue termination of parental rights before an initial disposition order is completed.

Mother's related assertion that she was unfairly denied the opportunity to contest a plan provision requiring that she be "forthcoming" about how O.S. was injured also lacks merit. Mother filed her objection stating that the child's injuries were due to the fact O.S. "suffered from Vitamin D deficiency which made his bones weak," and she was afforded a full and fair opportunity to contest the issue at the termination hearing.

Mother also claims that the State's decision to proceed to termination of parental rights at initial disposition unfairly "lifted the State's burden . . . to prove changed circumstances." She asserts, more specifically, that the State's decision to establish a goal of adoption would have been rejected by the court at an earlier modification hearing "because [m]other's explanation of O.S.'s injuries had been sufficient for the parties at merits and nothing had changed in the meantime to suggest that [m]other was not being truthful." The premise of the argument is mistaken. Mother's stipulation at merits stated that she had shaken O.S. on one occasion, and that she otherwise lacked "an adequate explanation for how the injuries occurred." Nothing at merits established that mother's explanation for the child's injuries was sufficient or truthful.

In a related vein, mother contends that the court's decision was improperly based on DCF's "change of heart" brought about by "consultation with its central office" to reject mother's stipulation at merits in which she allegedly "admitted wrongdoing and accepted full responsibility for the injuries." As noted, however, mother's stipulation at merits admitted merely that she had shaken the child on one occasion, and that she lacked an "adequate explanation" for the injuries. The medical evidence, by contrast, showed that the injuries had occurred on more than one occasion over a period of time.

Mother also challenges the court's allegedly unsupported "speculation about [her] drug use." Mother acknowledged that she tested positive for opiates in her own testimony, and the

3

court admitted without objection the results of a test administered by the Vermont Department of Health showing that mother tested positive for Oxycodone in September 2015. The test was administered pursuant to conditions of probation requiring that mother submit to random drug tests and remain substance free. The court's finding that mother had tested positive for non-prescribed drugs, "despite the risk that this may lead to a revocation of probation and her incarceration," was well supported.

Finally, mother notes the court's concern with the "fundamental question" of how O.S. sustained his injuries, and asserts that the court "failed to explain how this question (which should have been resolved once and for all by the merits stipulation) related to [m]other's current ability to parent." As noted, however, the merits stipulation did not resolve the issue of how O.S. sustained his injuries. Moreover, the court's decision provides a clear and cogent explanation, if such explanation were necessary, of how the grievous injuries sustained by O.S. while in mother's care reasonably relates to her current ability to parent. We find no error, and no basis to disturb the judgment.

In his separate appeal, father challenges the adequacy of the evidence and findings to support the judgment. We emphasize that our role "is not to second-guess the family court or to reweigh the evidence," but to determine whether the court abused its discretion. In re S.B., 174 Vt. 427, 429 (2002) (mem.). We will not disturb the court's findings unless they are clearly erroneous, In re B.W., 162 Vt. 287, 291 (1994), nor its conclusions if reasonably supported by the findings. In re A.F., 160 Vt. 175, 178 (1993). "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." Id.

Father maintains that the reasons underlying the court's conclusion that he could not resume parental responsibilities within a reasonable time were "flawed." First, he asserts that the court unfairly relied on father's failure to provide an adequate explanation for the child's injuries when it was mother who had cared for the child and pled guilty to the resulting criminal charges. The court, in fact, expressed doubt that father was being truthful in professing not to have any knowledge as to how O.S. sustained such serious injuries over time, and also expressed significant concern that father was contemplating reuniting with mother notwithstanding the potential risk to O.S. These concerns were supported by the evidence, and we discern no factual or legal flaw in the court's reliance on them. We also discern no merit to father's additional claim that DCF was at fault for failing to offer father specific counseling "to help him become disentangled from . . . mother." Father was provided counseling; the progress he made was up to him. See In re C.P., 2012 VT 100, ¶ 40 (rejecting argument that stagnation was caused by factors beyond parents' control where services were provided but progress was inadequate). The court's additional observation that father had not obtained independent, stable housing—while not the principal basis for its decision—was also supported by the evidence.

Father also claims that the court's findings concerning his relationship with O.S. and the role that he played in the child's life were flawed. Father asserts that his limited contact with O.S. was due to factors beyond his control, specifically the cessation of family time coaching, but father overlooks the evidence that his visits were suspended for a period due to his mental breakdown, and that overnight visits were consistently precluded by evidence that he did not live in a safe environment. Father further claims that the court underestimated his progress in finding

that he merely had "moments of success during some visits," asserting that this is contradicted by other findings that he had engaged well with O.S. since visits resumed in November 2014. The court's conclusion concerning father's role in the child's life reached a fair and reasonable balance in ultimately determining that this factor was "mixed," consisting of early neglect followed by a period of emotional instability, and more recent progress. We find no error.

Finally, father contends that the evidence failed to support the court's statement that it could "not find that [father] is particularly stable." Father does not challenge the court's underlying finding that "[t]he evidence demonstrates that [father] has become dysregulated and violent on multiple occasions when faced with a stressful situation"; rather, he notes that he had made progress during the year preceding the hearing. While the court acknowledged that progress, it did not negate the evidence of father's "longstanding history of anxiety, depression and suicidal ideation" or otherwise undermine the court's findings and conclusions. Father's additional claim that the court somehow reversed the burden of proof to demonstrate that his parental rights should not be terminated is unsupported. Accordingly, we find no basis to disturb the judgment.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

5